1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                    SOUTHERN DISTRICT OF CALIFORNIA

10

11  TERRY ANN NASH,              )  Civil No. 12cv2781 GPC(RBB)
                                 )
12            Plaintiff,         )  **REPORT AND RECOMMENDATION**
                                 )  **GRANTING PLAINTIFF'S MOTION**
13  v.                           )  **FOR SUMMARY JUDGMENT [ECF NO.**
                                 )  **11] AND DENYING DEFENDANT'S**
14  CAROLYN W. COLVIN, Acting    )  **CROSS-MOTION FOR SUMMARY**
    Commissioner of Social       )  **JUDGMENT [ECF NO. 13]**
15  Security,                    )
                                 )
16            Defendant.         )
    _____)
17

18       On November 16, 2012, Plaintiff Terry Ann Nash filed a civil

19  Complaint against Defendant Commissioner of Social Security,

20  Michael J. Astrue, challenging Defendant's denial of Plaintiff's

21  claim for disability insurance benefits [ECF. No. 1].  Defendant

22  filed an Answer and the Administrative Record on January 18, 2013

23  [ECF. Nos. 7, 9].

24       On March 25, 2013, Nash filed a Motion for Summary Judgment

25  [ECF No. 11].  Commissioner's Cross-Motion for Summary Judgment was

26  filed on April 19, 2013 [ECF No. 13].  The Defendant's Motion

27  indicates that Carolyn W. Colvin has replaced Astrue as the Acting

28  Commissioner of Social Security.  Colvin is therefore substituted

for her predecessor pursuant to Federal Rule of Civil Procedure 25(d).  Both Plaintiff and Defendant filed Replies [ECF Nos. 14, 15].

The Court has taken the motions under submission without oral argument [ECF No. 16].  For the following reasons, the Court recommends that Plaintiff's Motion for Summary Judgment be **GRANTED**, Defendant's Cross-Motion for Summary Judgment be **DENIED,** and the case be **REMANDED** for an award of benefits.

## I.  PROCEDURAL BACKGROUND

On January 8, 2009, Plaintiff Terry Ann Nash filed applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, alleging she has been disabled since June 25, 1997.  (Admin. R. 26, ECF No. 9.)  Plaintiff alleged she suffers from Meniere's disease, depression, anxiety disorder, vertigo, as well as back and neck problems.  (Id. at 263.)  She alleged she last worked as a temporary administrative assistant in July of 2008.  (Id. at 271, 284.)  Her applications were denied on initial review and again on reconsideration.  (Id. at 126-30, 131-35, 136-40.)

A hearing before the Administrative Law Judge Eve Godfrey was held on July 2, 2010.  (Id. at 47.)  Plaintiff, along with her attorney, appeared, and Nash testified at the hearing.  (Id. at 26.)  A medical expert and a vocational expert also testified. (Id.)  On July 30, 2010, the administrative law judge issued a decision finding that the Plaintiff was not entitled to a period of disability or disability insurance benefits under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act.  (Id. at 26-38.)

On September 3, 2010, Plaintiff requested that the Appeals Council reconsider the decision of the administrative law judge. (<u>Id.</u> at 21.)  On September 26, 2012, the Office of Hearings and Appeals sent notice that the Appeals Council had upheld the decision.  (<u>Id.</u> at 1-7.)

## II.  FACTUAL BACKGROUND

**A.  Medical Evidence**

**1.  UCSD Medical Center**

Plaintiff Terry Ann Nash was twenty-eight years old on the alleged onset date of her disability on June 25, 1997.  (<u>Id.</u> at 246.)  Nash testified that she was diagnosed with Meniere's disease, a condition that causes vertigo.  (<u>Id.</u> at 65.)  In connection with this disorder, on June 25, 1997, she underwent a left endolymphatic shunt procedure at the UCSD Medical Center in San Diego, California.  (<u>Id.</u> at 407.)  It was performed by doctors Jeffrey Harris and Drew Horlbeck.  (<u>Id.</u> at 407-08.)  On October 20, 1997, Nash returned to UCSD Medical Center and was seen by Gita Mehta, M.D. and David Reynaldo, M.D.  (<u>Id.</u> at 409.)  Clinical notes reflect that Plaintiff continued to experience persistent vertigo up to six times a day even after the surgical intervention.  (<u>Id.</u>)  During that visit, Nash requested a referral to psychiatry because "several of her physicians have recommended this in the past," even though she denied being depressed or suicidal.  (<u>Id.</u>)

**2.  Exodus Recovery Center**

Triage notes from the Exodus Recovery Walk-In Assessment Center, a division of San Diego County Mental Health Services, indicate that on January 15, 2009, Nash was seen as a walk-in for depression, suicidal ideation, and complaints of Meniere's disease.

(Id. at 388.)  She reported she felt helpless and defeated and had been standing by the train tracks.  (Id.)  She also stated that she "can't seem to keep work," was homeless but staying on the floor of her cousin's apartment, and had applied for section 8 housing. Although she was observed to be hyperverbal and "talked quite a bit about her situation," case management was unable to complete her follow-up plan.  The notes attribute this to Nash being "dizzy from not eating." (Id. at 387.)  Because of her suicidal thoughts, the center assisted Plaintiff with a safety plan, which she gladly accepted.  (Id.)  When Nash returned to Exodus on January 23, 2009, she continued to speak at a rapid pace, with a sad affect and moments of anger.  (Id. at 385).  On January 29, 2009, Plaintiff called to cancel her next appointment because her car broke down. She sounded tearful and reported feeling panicky, sad, and overwhelmed.  (Id. at 384).

### 3.  Dr. Rodarte

On February 16, 2009, Nash began treating with Dr. Gabriel Rodarte, M.D., a psychiatrist at Neighborhood Healthcare -- Behavioral Health department.  (Id. at 484-85, 502.)  Plaintiff initially reported a history of vertigo, depression, and being very sensitive to medications.  She also complained of consistent suicidal ideation since 2007.  (Id. at 484.)

Dr. Rodarte's exam notes from February 16, 2009, indicate fast and pressured speech; agitated behavior; a self-reported tendency to get angry and aggressive; a euthymic affect; a tangential and circumstantial thought process; and suicidal ideation chronically over the preceding two years but with no current plan or intent. (Id. at 485.)  The psychiatrist also noted that Nash was taking

4

fish oil and vitamins, and had "lots of odd beliefs."[1]  (Id. at 484).

Dr. Rodarte's initial diagnosis for Plaintiff was a mood disorder with the need to rule out bipolar disorder, major depressive disorder, and schizophrenia type I.  (Id. at 485.) Progress notes from March 5, 2009, indicate that Nash wanted to continue herbal medications but would consider lithium orotate in the future.  (Id. at 483.)  At her follow-up appointment on April 1, 2009, Nash was in a better mood, her behavior was calm, but her thought process was tangential with poor insight.  (Id. at 482.)

On April 21, 2009, Plaintiff exhibited fast speech, a down mood, tangential thought processes, suicidality, hallucinations, and continued "odd beliefs."  (Id. at 481.)  Nash's response to her medication regimen was poor, so Dr. Rodarte recommended Abilify. (Id.)  On May 5, 2009, Plaintiff had mildly pressured speech, a calmer mood, a tangential thought process, and continued "odd beliefs."  (Id. at 480.)  Dr. Rodarte diagnosed psychosis not otherwise specified and ruled out bipolar disorder.  (Id.)  He noted Plaintiff's insistence on using only natural products, and her unwillingness to try Abilify.  (Id.)  At that time, Nash was taking remedies prepared by her acupuncturist.  (Id.)

On June 29, 2009, Nash had mildly pressured speech, agitated behavior, a depressed mood, a restricted affect, suicidality, and fair insight and judgment.  (Id. at 561.)  Progress notes from that visit reflect that Plaintiff took Abilify for one week but stopped

---

[1] Because the photocopy of the handwritten notes from Dr. Rodarte is difficult to read, the Court was assisted by the summary provided in Plaintiff's Memorandum of Points and Authorities. (Pl.'s Mot. Summ. J. Attach. #1 Mem. P. & A. at 10-11, ECF No. 11.)

due to nausea.  (<u>Id.</u>)  Dr. Rodarte discontinued Abilify and
prescribed lithium at 300 milligrams.  (<u>Id.</u>)  The next month, Nash
reported "some sedation" from taking lithium.  (<u>Id.</u> at 560.)  Her
response to medication was fair, and her exam showed motor
retardation, a restricted affect, fair insight and judgment, and
suicidality.  (<u>Id.</u>)  Dr. Rodarte recommended that Nash continue
taking 300 mg of lithium.  (<u>Id.</u>)

By August 31, 2009, Nash was taking 600 milligrams of lithium,
and Dr. Rodarte increased her dosage to 900 milligrams.  (<u>Id.</u> at
559.)  On September 21, 2009, she reported not feeling like
herself, drinking lots of water, and having blurry vision.  Because
of these side effects, she decreased her dosage of lithium from 900
to 300-600 milligrams per day.  (<u>Id.</u> at 558.)  She stated that
lithium was helping with the "'chatter' in her head."  (<u>Id.</u>)  She
had one episode of suicidal ideation since the prior visit.  (<u>Id.</u>)
At the next session on October 29, 2009, Nash was taking 300
milligrams of lithium and demonstrated disorganization of thought,
mild agitation, mildly rapid speech, and fair judgment and insight.
(<u>Id.</u> at 557.)  By December 22, 2009, she reported feeling suicidal
"due to some social stressors," despite taking between 300 and 600
milligrams of lithium a day.  (<u>Id.</u> at 555.)  Plaintiff had rapid
speech, a "bad" mood, and reported auditory hallucinations that
told her to "kill [her]self."  (<u>Id.</u> at 555.)  By February 16, 2010,
the auditory hallucinations had receded, but her speech was rapid
and she had labile affect.  (<u>Id.</u> at 554.)  Dr. Rodarte noted her
response to treatment was fair.  (<u>Id.</u>)  On March 29, 2010, Nash
showed a circumstantial thought process, as well as poor insight
and judgment, despite taking 300-600 mg of lithium.  (<u>Id.</u> at 553).

6

Dr. Rodarte authored several reports describing his diagnosis and treatment of Plaintiff. In a letter dated May 7, 2009, Dr. Rodarte explained that since he began treating Nash on February 16, 2009, she exhibited symptoms of a thought disorder, along with pressured speech and tangential and disorganized thought processes, which made it "somewhat difficult to come up with a diagnosis right away." (Id. at 502). After having seen her five times, he diagnosed her as suffering from bipolar I disorder with psychotic features. (Id.) Dr. Rodarte described the effects of Nash's diagnosis as follows:

> She has a long history of inability to maintain employment secondary to her symptoms. She has not worked at a permanent or full time job since 1997, due to her illness. She has no history of alcohol or drug use. She has never been married and has no children. She has had difficulty even maintaining a residence bouncing from place to place. Given her current symptoms I do not believe she could succeed in a work environment.

(Id.) In another summary report from August 3, 2009, the doctor confirmed the same diagnosis of bipolar I disorder with psychotic features of such severity that "she has chronic suicidality," and repeated that she could not succeed in a work environment due to her symptoms. (Id. at 543.)

Several months later, on May 12, 2010, Dr. Rodarte completed a psychiatric/psychological impairment questionnaire regarding his treatment of Nash. (Id. 571-78.) He affirmed the diagnosis of bipolar I disorder with psychotic features and a current global assessment of functioning ("GAF") score of 50. (Id. at 571.) Her primary symptoms included pressured speech, tangential thought processes, mood swings with psychotic features, suicidal ideation, depression, and hypomania. (Id. at 573.) In Dr. Rodarte's

opinion, these symptoms were severe enough to impair Nash's work, social and personal functioning, and required emergency treatment in January 2009 at the Exodus Mental Health Recovery center. (<u>Id.</u>)

Dr. Rodarte found Plaintiff markedly limited in her abilities to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or proximity to others; to complete a normal work week without interruptions from psychological symptoms; and to perform at a consistent pace without rest periods of unreasonable length and frequency. (<u>Id.</u> at 574-76.) He found her moderately limited in the abilities to remember locations and work-like procedures; to understand, remember, and carry out simple instructions; to perform activities within a schedule; to maintain regular attendance and be reasonably punctual; to sustain ordinary routine without supervision; to respond appropriately to changes in the work setting; and to travel to unfamiliar places or use public transportation. (<u>Id.</u> at 574-76.)

Dr. Rodarte noted that Nash had past episodes of deterioration that exacerbated her symptoms due to work-related stress; she would be incapable of tolerating even a "low-stress" work environment; and she would likely miss two to three workdays a month. (<u>Id.</u> at 576-78.) The doctor noted that Plaintiff was taking 300-600 mg. of lithium daily, but blurred vision, the loss of appetite, and feeling numb were side effects of the medication. (<u>Id.</u> at 576.)

4.  <u>Dr. Suozzo</u>

On August 3, 2009, J.M. Suozzo, Jr., a supervising psychologist with the Neighborhood Healthcare in Escondido, California, and a psychology intern, Stephanie Knatz, wrote a

letter confirming they have treated Nash for anxiety and depression
since January 22, 2008. (Id. at 545.) They noted that Plaintiff
had been seen sixteen times, was diligent and punctual in
scheduling and keeping her appointments, and was "motivated to
continue to seek out help for her symptoms . . . ." (Id.) In a
subsequent letter dated June 29, 2010, Dr. Suozzo and psychology
intern Mary Elizabeth Skoch confirmed having individual weekly to
biweekly psychotherapy sessions with Nash since September of 2009,
and they described her condition as follows:

> Ms. Nash presents with aggravated distress in relation to
> her experience of Bipolar I Disorder with psychotic
> features. As evidenced by her mood disturbances (cycling
> between depression and hypomanic episodes), hostility and
> irritability, suicidal ideations, and emotional lability.
> Ms. Nash's symptoms cause clinically important distress,
> impairing her ability to function across all areas of her
> life.

(Id. at 580.) Dr. Suozzo and Skoch noted that Nash's response to
individual therapy and daily lithium of 300 to 600 milligrams was
"fair," and given her diagnosis and symptoms, Plaintiff would "need
to continue to manage her mood disorder on an ongoing basis by
continuing treatment indefinitely." (Id.)

    5.  Dr. Glassman

    California's Department of Social Services, Disability and
Adult Programs, referred Nash for a psychiatric evaluation to Dr.
Jaga Nath Glassman, a board-certified psychiatrist. (Id. at
430-35.) On March 21, 2009, Dr. Glassman prepared a report with
his findings based on his interview of Plaintiff and a review of
her records. (Id. at 430, 433-34.) He noted that Nash's
understanding of the reason for her evaluation was "'[b]ecause
everyone else says I have mental problems! Which I don't!'" (Id.

1   at 430.)  Although Plaintiff admitted to Dr. Glassman that she

2   drove to the railroad tracks with a plan to kill herself, Nash

3   denied having mental problems and seemed to attribute her issues to

4   Meniere's disease.  (Id. at 430-31.)

5       The interview with Dr. Glassman revealed Plaintiff to be "a

6   very poor historian, very scattered and somewhat disorganized."

7   (Id. at 431.)  The consulting psychiatrist noted her rapid and

8   pressured speech, and observed that she was almost impossible to

9   redirect.  (Id.)  Nash believed her dizziness was related to her

10  diet, which caused her to be very restrictive in her food choices.

11  (Id.)  The psychiatrist concluded that Nash appeared "too thin" and

12  was "certainly in anorectic weight range."  (Id.)  During the

13  evaluation, Plaintiff acknowledged she was being treated by a

14  psychiatrist and a psychologist, and that she took various

15  supplements and "'a plant-based Lithium.'"  (Id. at 432.)  She

16  explained her refusal to take any prescription medications by

17  stating, "'I don't want to be on psychiatric meds!  You can tell

18  I'm not psychotic! Your stupid friggin' medical community,' etc."

19  (Id.)  She also admitted to having problems with anger and temper.

20  (Id. at 431.)

21      Dr. Glassman observed that Nash's intellectual functioning was

22  above average, but her thought process was "disorganized,

23  tangential, with a near-frantic quality."  (Id. at 433.)  She

24  appeared "very hyper, with rapid, pressured speech, hyperverbal."

25  (Id.)  Plaintiff's demeanor was intrusive, controlling, and

26  demanding.  The psychiatrist sensed "significant underlying anger."

27  (Id.)  At the end of the interview, she refused to leave, demanding

28  to know Dr. Glassman's findings.  (Id.)  When the psychiatrist did

not reveal his opinion, Nash became angry and overly intrusive, and he was forced to set "firm limits" to get her to leave.  (Id.)

Dr. Glassman's clinical impression was that Nash suffered from a severe borderline personality disorder, an associated eating disorder, and severe somatic preoccupation/somatization.  (Id. at 434.)  He assessed her GAF at 45, finding that "[s]he has major problems functioning."  (Id.)  Dr. Glassman summarized his evaluation of Plaintiff:

> This is a sad case of a severely decompensated Borderline Personality Disorder patient with severe somatization and a severe eating disorder.  She has been unable to maintain any stability in her life with chronic homelessness that she blames on her "dizziness" and "autoimmune diseases" and food preoccupations.
>
> She has significant impairments in her capacity to function in a workplace setting.  She is likely to have marked impairments in her capacity to get along adequately with others, with her hyper, intrusive and angry quality.  She has difficulty regulating her affect states and associated difficulty behaving in a socially appropriate manner.  She is likely to have difficulty understanding and following even simple instructions consistently, as she is so disorganized and frantic and "hyper."  She is not likely to be capable of maintaining concentration, persistence and pace for even simple tasks.

(Id.)  He also found that she is likely not capable of managing her own funds due to her "extremely poor judgment."  (Id.)

6.  Medical expert testimony

Dr. Alfred G. Jonas, a psychiatrist, testified as a medical expert at the administrative hearing.  (Id. at 93-113, 224-227.)  Dr. Jonas first noted that Nash suffers from a wide range of psychiatric impairments that could possibly be classified under

sections 12.03,[2] 12.04,[3] 12.06,[4] 12.07,[5] and 12.08[6] of the listed impairments, and observed that "[t]his is a very complicated case." (Id. at 93-94.)  He also noted that Meniere's disease was Plaintiff's only nonpsychiatric issue.  (Id. at 93.)  After reviewing the medical evidence and listening to Nash's testimony, the medical expert concluded that "12.03 [schizophranic, paranoid and other psychotic disorders] is the best way to summarize this case."  (Id. at 94.)  Dr. Jonas acknowledged that the treating physician's diagnosis was under section 12.04 -- pertaining to affective disorders -- and explained that in his opinion, the correct diagnosis was under section 12.03, although "the other disorder is lurking in there partially."  (Id.)

The medical expert noted that Nash had "a pretty significant range of impairments" that affect her activities of daily living, but she seemed to improve after finding a stable residence.  (Id. at 94-95.)  As to her social functioning, however, Dr. Jonas observed a "distortion of interpersonal relating" that based on the record was "at or near the listing level" most of the time.  (Id. at 95.)  He described Plaintiff's interactions with others as "dependent relationships" and stated that "[s]he does not come across as a socially fully functional person in these episodes of interpersonal relating."  (Id. at 96.)  The expert concluded that

---

[2] Schizophrenic, paranoid and other psychotic disorders.  See 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.03 (2013).

[3] Affective disorders.  Id. § 12.04.

[4] Anxiety-related disorders.  Id. § 12.06.

[5] Somatoform disorders.  Id. § 12.07.

[6] Personality disorders.  Id. § 12.08.

despite her treatment with lithium, "Ms. Nash is really a kind of a
marginal social person and really can only function in sort of
primitive ways that are relatively structured and allow her to be
somewhat dependent within the system."  (<u>Id.</u> at 99-100.)

**B.  Plaintiff's Testimony**

Plaintiff was forty-one years old at the time of the hearing
on July 2, 2010.  (<u>Id.</u> at 45, 50.)  She had never been married and
had no children.  (<u>Id.</u> at 100, 430.)  Plaintiff appeared in person
and testified at the hearing before Judge Godfrey.  The transcript
of her testimony reveals that Nash provided an erratic account of
her personal history and frequently could not remember dates or
other pertinent information:

Q.  When was the last time that you worked, Ms. Nash?

A.  Oh my goodness, I think – I'm not lying on purpose, I
think it was –

Q.  What do you mean you're not lying on purpose?

A.  I mean if I make the year, it may not be the correct
one.  I think it was 2006, 2007.  It was for a temp
agency I think was the last one I worked for.

(<u>Id.</u> at 51.)  She worked as a part-time bilingual instructional
aide to high school students and also taught English to adults for
five years until 1997.  (<u>Id.</u> at 54-56.)  Starting in 1997, Nash
worked as a customer service representative for a hospital supply
company for several years until she was let go.  (<u>Id.</u> at 55-56.)
Plaintiff later held part-time administrative and clerical
positions through a temp agency, including working for the County
of Riverside for several weeks in 2006 and then again in 2007.
(<u>Id.</u> at 51, 60.)  After her temp assignments ended, she applied to
secretarial and food service jobs, but could not find another

position.  (Id. at 52.)  Nash testified she subsequently received
unemployment until 2009:  "I think I, I think I was on 2008 to 2009
I believe it was, I believe.  I have so many numbers in my head,
your honor, I honestly can't remember but I do believe it was till
2009."  (Id. at 52-53.)

When Judge Godfrey inquired whether Nash would be able to work
if she found a job, Plaintiff stated:

> Well the thing is, as I was explaining to Lori [Nash's
> attorney], I usually – after the temp job I think I was
> off a few months and I worked six weeks for the county of
> Riverside and my supervisor told me off-the-record that I
> was too slow and not cut out for it and that always seems
> to be the problem.  I don't catch on fast enough, I'm too
> slow, I take too many notes, I don't understand, they
> have to repeat themselves 50 times.  So it isn't that – I
> don't think it's finding the job, it's keeping the job
> that is always the problem for me.

(Id. at 53.)  Nash explained that she received similar feedback
even when the work was less demanding:  "[T]hey always use the word
slow.  Slow, I just can't catch on.  Even though I'm articulate
when I speak I'm slow.  And I carry a note pad with me everywhere I
go at work taking notes and it always seems to be a problem for
people."  (Id. at 54.)

In 2005, Plaintiff obtained a bachelor of arts degree in
political science from San Diego State University.  (Id. at 86,
269.)  It took her fourteen years to complete her degree, and she
required special accommodations from the school to study and take
exams:

> Q.  And where did you get [your degree] from?
>
> A.  San Diego State University.  Yeah, I was with – it
> took me, you know, I talked to – I had done the State of
> California Rehabilitation Program years ago.  I think you
> probably won't have records for that.  And at any rate,
> you know, with my depression and just with everything I

14

1      was going through, everyone including her, the rehab
       counselor had all suggested, you know, maybe you could
2      look at going to college and getting something if you
       can't work outside the home, maybe you can work in the
3      home.  And that didn't even work out for me.  But at any
       rate I wound up – I got taken in by disabled students and
4      I was with the[m] for 14 years but I did it, I did it and
       I got my, you know, 14 years later but.
5

6   (Id. at 86-87.)

7        Plaintiff's Meniere's disease made her feel "so bad [she]

8   wasn't walking."  (Id. at 65, 74.)  She testified she struggled

9   with depression her entire life.  (Id. at 75.)  Her condition

10  caused her auditory hallucinations and suicidal ideation.  (Id. at

11  65, 79.)  Although she tried "regular medication" to treat her

12  depression, the treatment "exasperated [her] condition and made it

13  worse."  (Id. at 65.)

14       Plaintiff claimed that despite conventional medical treatment

15  she continued to "hear voices, more voices."  (Id.)  The "different

16  voices" in her head were "menacing" and sometimes told her to kill

17  herself.  (Id. at 80.)  Nash stated that she suffers from

18  nightmares and sometimes has crying spells that can last for

19  several days.  (Id. at 82-83.)  She experienced manic periods when

20  her mood would be either really high to really low.  (Id. at 78.)

21       Nash testified that her Meniere's disease causes episodic

22  vertigo and makes her feel dizzy, almost as if she were drunk.

23  (Id. at 74.)  Plaintiff explained that she has a disabled placard

24  for her car because of the vertigo and panic attacks.  (Id. at 88-

25  89.)  She claimed that dizziness medication always causes her to

26  have "more vertigo," and she manages her symptoms by exercise and

27  meditation.  (Id. at 89.)  Her current regimen involves exercise

28  five days a week, supplements, meditation, and eating well.  (Id.

at 65.)  She also is in therapy every week, and sees her

psychiatrist, Dr. Rodarte, once or twice a month.  (<u>Id.</u> at 66.)

Dr. Rodarte prescribed her lithium which she takes daily, her dose

ranging from 300 to 600 milligrams.  (<u>Id.</u> 67.)

The ALJ inquired: "Well now with this Lithium that you take,

you don't have these highs and lows anymore right?"  (<u>Id.</u> at 79.)

Plaintiff replied:

> I do, it stabilizes me more but I guess I told Dr.
> Rodarte that I want something that's going to totally
> completely rectify my situation and take away the voices
> and take away all the stuff.  And he said that that's not
> really feasible.  I'm doing better on the Lithium with
> the therapy and the Lithium but he said his goal is just,
> there isn't anything that he can do that, you know, to
> stop period.  I will probably struggle with it the rest
> of my life since I have been my entire life.  That's what
> he told me.  I don't know if it's true.  I don't know.  I
> just want a little nob, just to click, to shut it off,
> that's it.

(<u>Id.</u>)  Despite being on medication, Nash testified that she had a

"really rough last two weeks" when an event triggered a memory from

her past, resulting in an emotional setback.  (<u>Id.</u> at 68-69.)  When

describing her feelings of anger related to the setback, Plaintiff

became disturbed by the presence of Mr. Cummings, the vocational

expert, and the hearing had to be interrupted so he could leave the

room.  (<u>Id.</u>)

Nash testified the last time she was in a relationship was

three years ago, but her boyfriend dumped her because she did not

believe in premarital sex.  (<u>Id.</u> at 100.)  When Judge Godfrey asked

Plaintiff about her friendships, she stated:  "I just have one

friend that calls me, April, and I met her in rehab, State of

California Rehabilitation 15 years ago and she calls me every day

to check on me."  (<u>Id.</u> at 101.)  Nash explained that she gets phone

calls from her sister sometimes, and she visits her former boss "because she happens to be on the reservation" where Plaintiff is able to receive dental care. (<u>Id.</u>)

## C.   The ALJ's Findings

The ALJ found that Plaintiff satisfied the insured status requirements of the Social Security Act through September 30, 2002. (<u>Id.</u> at 28.)  Judge Godfrey also found that Nash engaged in substantial gainful activity from 2000 through 2003 and 2005 through mid-2008. (<u>Id.</u> at 29.)  The ALJ concluded that Plaintiff has the following severe impairments:  Meniere's disease, depression, and a personality disorder. (<u>Id.</u>)  Judge Godfrey, however, determined that Nash does not have an impairment or combination of impairments that meets or equals a listing. (<u>Id.</u>)

In her decision, the ALJ noted that the medical expert, Dr. Jonas, conducted a "thorough review of the medical records and the claimant's testimony" and concluded that Nash "has psychiatric issues, possible impairments include a schizoaffective disorder, an affective disorder, an anxiety-related disorder, a somatoform disorder, and a personality disorder." (<u>Id.</u> at 33.)  The ALJ acknowledged the expert's testimony that Plaintiff "did meet medical listing 12.03 based on the record[,]" however, she rejected his opinion. (<u>Id.</u> at 34-35.)  The ALJ gave the following reasons for rejecting Dr. Jonas's opinion:  (1) the expert disagreed with the treating psychiatrist's assessment that Plaintiff's social functioning was unimpaired; (2) Dr. Jonas referenced the consultative evaluation by Dr. Glassman that was performed "before the claimant started on Lithium and there is no doubt that she has had a significant improvement with the Lithium[]"; (3) Nash "seems

to function reasonably well ADL wise, as long as she has an available place to stay[]"; and (4) the ALJ's uncertainty over whether Plaintiff is "really functionally deteriorated" or whether Nash is "right in saying that if she could only find somebody who would hire her, that she could do the job." (Id. at 34-35.)

Judge Godfrey also acknowledged that board-certified psychiatrist, Dr. Glassman, opined that Plaintiff suffered from a "severe borderline personality disorder, an associated eating disorder, and severe somatic preoccupation/somatization." (Id. at 31-32.) The ALJ gave less weight to Dr. Glassman's opinion because he saw Nash "on March 21, 2009, which was before she was stabilized on Lithium." (Id. at 34.) In discussing the treating psychiatrist's conclusions, the ALJ stated that Dr. Rodarte's notes are "mostly illegible; and therefore, not able to be used." (Id. at 31.) Judge Godfrey observed that Dr. Rodarte wrote several letters explaining that Plaintiff had a bipolar I disorder with psychotic features and was unable to maintain employment due to her symptoms. (Id. at 32-33.) She stated that the doctor's letters appeared to be identical. (Id. at 32.) The ALJ then discussed the psychiatric impairment questionnaire completed by Dr. Rodarte, including his findings of "social withdrawal," "markedly limited abilities in several of the areas of functioning," and inability to tolerate even low work-related stress. (Id. at 33.) The decision appears to dismiss these findings as not being supported by laboratory of diagnostic tests. (Id.)

Without referencing dates or physicians' names, Judge Godfrey noted that the medical records contain "requests to [Nash's] doctor's [sic] to fill out forms or otherwise support her in

obtaining housing, food stamps, general relief and supplemental security income. (Id. at 35.) Judge Godfrey expressed a concern that the claimant's doctors "appear[ed] to be advocates for the claimant and not acting in their roles of treating doctors." (Id.) On this basis, the ALJ concluded that the doctors' "contemporaneous notes" were more credible. (Id.)

The ALJ found Plaintiff's testimony about her subjective symptoms not credible, enumerating the following reasons for this finding: (1) Nash's activities of daily living are not indicative of a disabling impairment; (2) Plaintiff denied being depressed or suicidal on October 20, 1997; (3) as of October 20, 1997, records showed that Plaintiff's Meniere's disease symptoms were slowly improving; (4) Nash represented to staff at the Neighborhood Healthcare Center on January 14, 2009, and to Dr. Glassman on March 21, 2009, that she had not worked since 1996; however, her earnings records show otherwise; (5) Plaintiff refused to take psychiatric or other medications on December 16, 2008, which is not consistent with a disabling level of impairment; (6) Nash took college courses at the graduate level until 2005, which is inconsistent with inability to work; (7) Plaintiff's only medications were vitamins, amino acids, and fish oil, which is inconsistent with a disability; (8) Nash told a consultative internist that she was "doing fine" until she entered menopause and started to have more vertigo attacks; (9) no physician has ever opined that a listing level limitation was met or equaled; (10) objective evidence in the medical record does not establish impairments that could produce

limitations likely to last for twelve or more months.[7]  (<u>Id.</u> at 35-
36.)

     Next, the ALJ found that Nash was unable to perform her past
relevant work based on the testimony of a vocational expert, Alan
E. Cummings.  (<u>Id.</u> at 36.)  Given Plaintiff's age, education, work
experience, and residual functional capacity, Judge Godfrey found
that Nash was capable of performing other jobs that existed in
significant numbers in the national economy.  (<u>Id.</u> at 37.)

### III.   DISCUSSION

**A.   Legal Standards**

     To qualify for disability benefits under the Social Security
Act, an applicant must show two things:  (1) He or she suffers from
a medically determinable impairment that can be expected to last
for a continuous period of twelve months or more, or would result
in death; and (2) the impairment renders the applicant incapable of
performing the work that he or she previously performed or any
other substantially gainful employment that exists in the national
economy.  <u>See</u> 42 U.S.C.A. §§ 423(d)(1)(A), (2)(A) (West 2011).  An
applicant must meet both requirements to be classified as
"disabled."  <u>Id.</u>

     The Commissioner makes this assessment by a five-step analysis
outlined in 20 C.F.R. § 404.1520 (West 2012).  <u>See also</u> <u>Tackett v.</u>
<u>Apfel</u>, 180 F.3d 1094, 1098-99 (9th Cir. 1999) (describing five
steps).  First, the Commissioner determines whether a claimant is
engaged in "substantial gainful activity."  If so, the claimant is

---

[7] The ALJ purports to give eleven reasons for finding Nash not
credible; however, the opinion omits reason number eight from the
list; as a result, reason number seven is followed by reason number
nine.  (<u>See</u> Admin. R. 36, ECF No. 9.)

not disabled.  20 C.F.R. § 404.1520(b).  Second, the Commissioner determines whether the claimant has a "severe impairment or combination of impairments" that significantly limits the claimant's physical or mental ability to do basic work activities. If not, the claimant is not disabled.  Id. § 404.1520(c).  Third, the medical evidence of the claimant's impairment is compared to a list of impairments that are presumed severe enough to preclude work; if the claimant's impairment meets or equals one of the listed impairments, benefits are awarded.  Id. § 404.1520(d). Fourth, if the impairment meets or equals one of the listed impairments, the Commission determines whether the claimant can do his past relevant work.  If the claimant can do his past work, benefits are denied.  Id. § 404.1520(e).  If the claimant cannot perform her past relevant work, the burden shifts to the Commissioner.  In step five, the Commissioner must establish that the claimant can perform other work.  Id. § 404.1520(f).  If the Commissioner meets this burden and proves that the claimant is able to perform other work that exists in the national economy, benefits are denied.

Sections 405(g) and 421(d) of the Social Security Act allow unsuccessful applicants to seek judicial review of a final agency decision of the Commissioner.  42 U.S.C.A. §§ 405(g), 421(d) (West 2011).  The scope of judicial review is limited, however, and the denial of benefits "'will be disturbed only if it is not supported by substantial evidence or is based on legal error.'"  Brawner v. Sec'y of Health & Human Servs., 839 F.2d 432, 433 (9th Cir. 1988) (quoting Green v. Heckler, 803 F.2d 528, 529 (9th Cir. 1986)).

12cv2781 GPC(RBB)

Substantial evidence means "'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997) (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)).  The court must consider the entire record, including the evidence that supports and detracts from the Commissioner's conclusions. Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988).  If the evidence supports more than one rational interpretation, the court must uphold the ALJ's decision.  Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).  When the evidence is inconclusive, "'questions of credibility and resolution of conflicts in the testimony are functions solely of the Secretary.'" Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982) (quoting Waters v. Gardner, 452 F.2d 855, 858 n.7 (9th Cir. 1971)).

The ALJ has a special duty in social security cases to fully and fairly develop the record in order to make an informed decision on a claimant's entitlement to disability benefits.  DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).  Because disability hearings are not adversarial in nature, the ALJ must "inform himself about the facts relevant to his decision," even if the claimant is represented by counsel.  Dixon v. Heckler, 811 F.2d 506, 510 (10th Cir. 1987) (quoting Heckler v. Campbell, 461 U.S. 458, 471 n.1 (1983) (Brennan, J., concurring).

Sections 205(g) and 1631(c)(3) of the Social Security Act allow applicants whose claims have been denied by the Social Security Administration to seek judicial review of the Commissioner's final agency decision.  42 U.S.C.A. §§ 405(g),

1383(c)(3).  The district court may affirm, modify, or reverse the
Commissioner's decision.  _Id._  The court should affirm the decision
unless "it is based upon legal error or is not supported by
substantial evidence."  _Bayliss v. Barnhart_, 427 F.3d 1211, 1214
n.1 (9th Cir. 2005) (citing _Tidwell v. Apfel_, 161 F.3d 599, 601
(9th Cir. 1999)).

A district court may remand a Social Security disability
decision under sentence four of 42 U.S.C. § 405(g).  _Hoa Hong Van
v. Barnhart_, 483 F.3d 600, 605 (9th Cir. 2007).  That provision
states, "The court shall have power to enter, upon the pleadings
and transcript of the record, a judgment affirming, modifying, or
reversing the decision of the Commissioner of Social Security, with
or without remanding the cause for a rehearing."  42 U.S.C.A.
§ 405(g).  "A remand under sentence four is 'essentially a
determination that the agency erred in some respect in reaching a
decision to deny benefits[]' . . . ."  _Hoa Hong Van v. Barnhart_,
483 F.3d at 605 (quoting _Akopyan v. Barnhart_, 296 F.3d 852, 854
(9th Cir. 2002)).  After a case is remanded and an additional
hearing is held, the Commissioner may modify or affirm the original
findings of fact or the decision.  42 U.S.C.A. § 405(g).

A remand to the Commissioner for further proceedings or to
award benefits is within the court's discretion.  _McAllister v.
Sullivan_, 888 F.2d 599, 603 (9th Cir. 1989).  "'If additional
proceedings can remedy defects in the original administrative
proceedings, a social security case should be remanded.  Where,
however, a rehearing would simply delay receipt of benefits,
reversal [and an award of benefits] is appropriate.'"  _Id._
(alteration in original) (quoting _Lewin v. Schweiker_, 654 F.2d 631,

635 (9th Cir. 1981)).  As a matter of administrative law, "the proper course, except in rare circumstances, is to remand to an administrative agency for additional investigation or explanation." <u>INS v. Ventura</u>, 537 U.S. 12, 16 (2002) (internal quotation marks and citation omitted).

## B.  Plaintiff's Claims

In her Motion for Summary Judgment, Plaintiff asks the Court to reverse the Commissioner's final decision and remand the case for an award of benefits or, alternatively, for further proceedings.  (Pl.'s Mot. Summ. J. Attach. #1 Mem. P. & A. 1, 27-28,[8] ECF No. 11.)  Nash advances three arguments in support of her motion.  First, she argues that the ALJ improperly discredited testimony from medical expert Dr. Jonas that Plaintiff's psychiatric condition meets the criteria of listing 12.03.  (<u>Id.</u> at 16-20.)  Plaintiff also contends that Judge Godfrey erred in rejecting the functional capacity opinions of treating psychiatrist Dr. Rodarte and consultative psychiatrist Dr. Glassman.  (<u>Id.</u> at 20-23.)  Finally, Nash claims that the Commissioner committed legal error in finding Plaintiff's subjective complaints were not credible, and that this finding was not supported by substantial evidence.  (<u>Id.</u> at 23-27.)

### 1.  <u>ALJ's rejection of the medical expert opinion</u>

Plaintiff argues that the ALJ's determination at step three that Nash's condition does not meet or equal the criteria of listing 12.03 was error.  (<u>Id.</u> at 16.)  Nash points out that Dr. Jonas, the testifying medical expert and board-certified

---

[8] Because Plaintiff's Memorandum is not consecutively paginated, the Court will cite to it using the page numbers assigned by the electronic case filing system.

psychiatrist and neurologist, thoroughly reviewed the record and listened to her testimony, and he opined that her psychiatric condition meets the criteria of listing 12.03. (Id.) Plaintiff contends that the ALJ's reasons for rejecting Dr. Jonas's conclusion are not supported by the record. (Id. at 17.)

In the Cross-Motion, Defendant generally argues that the Commissioner's decision should be affirmed because it is supported by substantial evidence and is free from legal error. (Cross-Mot. Summ. J. Attach. #1 Mem. P. & A. 3-12, ECF No. 13.) Defendant also briefly contends that the ALJ properly discredited Dr. Jonas's "unclear" opinion and concluded that Nash's impairments do not meet or equal the criteria of listing 12.03. (Id. at 11.)

The Code of Federal Regulations describes the standards for evaluating medical opinion evidence. 20 C.F.R. § 404.1527(a)(2)-(b) (2012). The regulations provide that although the Commissioner will consider opinions from medical sources on issues such as the claimant's functional capacity and whether the claimant has an enumerated impairment, "the final responsibility for deciding these issues is reserved to the Commissioner." Id. at § 404.1527(d)(2). Because the ALJ has the sole responsibility of making the determination whether a claimant meets the statutory definition of a disability, "[a] statement by a medical source that [he is] 'disabled' or 'unable to work' does not mean that [the ALJ] will determine that [he is] disabled." Id. at (d)(1).

The ALJ acknowledged Dr. Jonas's testimony that Nash "did meet medical listing 12.03 based on the record." (Admin. R. 34, ECF No. 9.) Nonetheless, Judge Godfrey rejected the expert's opinion:

> [T]here were two things that appear to interfere with that opinion, first is that [Nash] seems to function reasonably well ADL wise, as long as she has an available place to stay. The other is a question of whether she is really functionally chronically deteriorated in a way that would be the same as listing C criteria or is that claimant right in saying that if she could only find somebody who would hire her, that she could do the job.

(Id.) Nash is critical of the ALJ taking Plaintiff's assessment of her social functioning at face value without viewing it "through the prism of psychiatric expertise." (Pl.'s Mot. Summ. J. Attach. #1 Mem. P. & A. 17, ECF No. 11.) Defendant responds that the ALJ properly discredited Dr. Jonas's opinion because it was "unclear and inexplicable, particularly in light of Plaintiff's improvement with treatment and permanent housing." (Cross-Mot. Summ. J. Attach. #1 Mem. P. & A. 10, ECF No. 13.)

The stated rationale for the ALJ's rejection of the medical expert's opinion appears to be the Plaintiff's self-assessment of her condition. This is troubling for a number of reasons. First, Nash's beliefs regarding her ability to work are less optimistic than Judge Godfrey described. Plaintiff repeatedly explained that she had problems staying employed: "I don't think it's finding the job, it's keeping the job that is always the problem for me." (Admin. R. 53, ECF No. 9.) "I can't maintain employment as evidenced by my sporadic work history and all my years of homelessness"; "I could never maintain a job and I was always moving around." (Id. at 62.) Nash also stated that most of her employers criticized her for being slow and unable to prioritize tasks, and that adversely affected her job performance. (Id. at 53, 85.) Second, Nash's subjective symptom testimony, which the ALJ ultimately rejected as not credible, was that despite her

ongoing treatment, Plaintiff still hears voices, has manic periods
when she becomes aggressive, hostile, and angry, as well as periods
when her mood is low, to the point where she does not leave the
apartment.  (See id. at 65, 78-80, 93.)

Additionally, a review of the transcript reveals that the
reasons stated for rejecting Dr. Jonas's opinion were actually
observations made by the medical expert himself during his
examination by the claimant's attorney:

> Q.:  So then is it your testimony that she does in fact
> meet 12.03 doctor?
>
> A.: I think she does based on the record.  And as I said
> [w]hat interferes with that are two things, are the fact
> that she seems to function reasonably well ADL wise as
> long as she has an available place to stay. . . . .  And
> the other thing that interferes is the question of
> whether she's really sort of functionally chronically
> deteriorated in the way that would be the same as the
> listing level for item 4B criteria or is she in some
> sense right that if she could only find somebody to hire
> her that she could do the job.

(Id. at 109.)  Once the medical expert heard more testimony
regarding Nash's housing and food stamp assistance, he concluded
that Plaintiff's ADL levels were only minimally impaired "at best.
When things have not been the best then we would be looking
[INAUDIBLE] level."  (Id. at 113.)

Judge Godfrey also rejected Dr. Jonas's testimony, claiming
she "did not understand the medical expert's disagreement with the
assessment by Dr. Rodarte, the claimant's treating psychiatrist,
who assessed her social functioning at unimpaired."  (Id. at 34.)
This statement, however, is factually inaccurate.  Nash points out
that ALJ failed to cite to any part of the record that reflects
such a finding by Dr. Rodarte.  (Pl.'s Mot. Summ. J. Attach. #1
Mem. P. & A. 18, ECF No. 11.)  On the contrary, Dr. Rodarte opined

that her symptoms caused "clinically important distress, impairing work, social and personal functioning," and found Nash markedly limited in her ability to work with others without being distracted by them. (Admin. R. 573-74, ECF No. 9.) Dr. Jonas's opinion appears to be largely consistent with that of Plaintiff's treating physician. The medical expert felt that Plaintiff was not a "socially fully functional person" due to a distortion in interpersonal relating. (Id. at 96.) As an opinion supported by other medical evidence and consistent with the record as a whole, the medical expert's conclusion was entitled to more weight. 20 C.F.R. § 404.1527 (c)(3)-(4).

Finally, the ALJ also rejected Dr. Jonas's opinion and his reliance on the evaluation by consultative psychiatrist Dr. Glassman, stating that Dr. Glassman evaluated Nash before she began treatment with lithium. (Admin. R. 34, ECF No. 9.) Yet, the ALJ overlooked Dr. Jonas's testimony that even with lithium treatment, Dr. Rodarte found Nash exhibiting disordered thoughts and pressured, tangential, and disorganized speech. (Id. at 99.) This, according to the medical expert, "has to be reflected to social functioning." (Id.)

Defendant's argument that the medical opinion of Dr. Jonas is "unclear" is not well taken. First, the ALJ did not advance this as a reason for rejecting the opinion. Tommasetti v. Astrue, 533 F.3d 1035, 1039 n.2 (9th Cir. 2008); see also Pinto v. Massanari, 249 F.3d 840, 847-48 (9th Cir. 2001). Second, the ALJ in a social security case has an independent "duty to fully and fairly develop the record and to assure that the claimant's interests are considered[,]" Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir.

28

12cv2781 GPC(RBB)

2001) (internal quotation marks omitted), even where a claimant is represented by counsel.  Id.  This duty is triggered when the record reflects ambiguous evidence, or the ALJ finds that the record is inadequate for a proper evaluation.  Id. (internal citations omitted).  Thus, if the ALJ believed the medical expert opinion was ambiguous, she had a duty to clarify it.

The ALJ chose to reject the opinion of Dr. Jonas, which was consistent with those of Dr. Rodarte, Plaintiff's treating physician.  Although Judge Godfrey relies on Nash's testimony regarding her condition, the ALJ states that Plaintiff's "lack of honesty calls all of the claimant's credibility into question." (Admin. R. 35, ECF No. 9.)  The ALJ "may reject the opinion of a nonexamining physician by reference to specific evidence in the medical record."  Sousa v. Callahan, 143 F.3d 1240, 1244 (9th Cir. 1998).  Viewing the record as a whole, the ALJ's decision does not articulate adequate reasons supported by substantial evidence for rejecting the opinion of the impartial medical expert.  See Davis v. Astrue, 444 F. App'x 151, 152 (9th Cir. 2011) (finding that ALJ erred by failing to provide legally adequate reasons for rejecting the testimony of a medical expert that was largely consistent with opinion of claimant's treating psychologist).

2.  Standards for reviewing the consultative psychiatrist's and treating psychiatrist's opinions

Nash also contends that ALJ Godfrey erred in rejecting the functional capacity opinions of treating psychiatrist Dr. Rodarte and consultative psychiatrist Dr. Glassman.  (Pl.'s Mot. Summ. J. Attach. #1 Mem. P. & A. 20-23, ECF No. 11.)  Defendant responds that the ALJ properly assessed and resolved the conflicts in the

29

medical opinions, and the decision is supported by substantial evidence and is free from legal error. (Cross-Mot. Summ. J. Attach. #1 Mem. P. & A. 7-10, ECF No. 13.)

Generally, a treating physician's opinion must be accorded controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] case record . . . ."  20 C.F.R. § 404.1527(c)(2).  If the treating physician's opinion is not given controlling weight, the following factors are applied in determining what weight to give the opinion: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treating relationship, (3) the relevant evidence supporting the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the treating physicican, and (6) any other factors brought to the attention of the ALJ which tend to support or contradict the opinion.  Id. § 404.1527(c)(2)(i)-(ii), (c)(3)-(6).

Opinions of treating physicians may only be rejected under certain circumstances.  See Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004).  "Cases in [the Ninth Circuit] distinguish among the opinions of three types of physicians:  (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)."  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995) (footnote omitted).

The standard for determining whether an ALJ properly rejected the opinion of a treating physician varies.  If the treating doctor's opinion is not contradicted by another physician, the ALJ must give clear and convincing reasons for rejecting it.  <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>see also</u> <u>Spelatz v. Astrue</u>, 321 F. App'x 689, 692 (9th Cir. 2009); <u>Lester</u>, 81 F.3d at 830.  On the other hand, if the treating physician's opinion is contradicted, "[t]he ALJ must give specific, legitimate reasons for disregarding the opinion of the treating physician.'" <u>Batson</u>, 359 F.3d at 1195 (quoting <u>Matney v. Sullivan</u>, 981 F.2d 1016, 1019 (9th Cir. 1992)); <u>see also</u> <u>Orn v. Astrue</u>, 495 F.3d 625, 632 (9th Cir. 2007).  An ALJ may discredit opinions "that are conclusory, brief, and unsupported by . . . objective medical findings." <u>Batson</u>, 359 F.3d at 1195.

The opinion of an examining doctor is entitled to greater weight than that of a nonexamining doctor.  <u>Lester</u>, 81 F.3d at 830 (citing <u>Pitzer v. Sullivan</u>, 908 F.2d 502, 506 (9th Cir. 1990); <u>Gallant v. Heckler</u>, 753 F.2d 1450 (9th Cir. 1984)).  "In addition, the regulations give more weight to opinions that are explained than to those that are not, and to the opinions of specialists concerning matters relating to their specialty over that of nonspecialists." <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing 20 C.F.R. § 404.1527(d)(3), (5)).  As with the opinion of a treating physician, the opinion of an examining doctor, if contradicted by another doctor, may be rejected only for "specific and legitimate" reasons supported by substantial evidence in the record.  <u>Andrews v. Shalala</u>, 53 F.3d at 1043; <u>Lester</u>, 81 F.3d at 830-31.

"The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining or a treating physician." Lester, 81 F.3d at 831 (citing Pitzer, 908 F.2d at 506 n.4; Gallant, 753 F.2d at 1456)). "[T]he report of [a] non-treating, non-examining physician, combined with the ALJ's own observance of [the] claimant's demeanor at the hearing d[oes] not constitute substantial evidence" and does not support an ALJ's "decision to reject the examining physician's opinion that the claimant [is] disabled." Id. (quoting Gallant, 753 F.2d at 1456) (internal quotation marks omitted).

### a. Consultative psychiatrist

According to Plaintiff, the ALJ's only reason for rejecting the opinion of the consultative psychiatrist Dr. Glassman was that Dr. Glassman saw Nash in March 2009, before she was stabilized on lithium. (Pl.'s Mot. Summ. J. Attach. #1 Mem. P. & A. 21, ECF No. 11.)   Nash argues that this reason is based on the incorrect assumption that her condition stabilized after she started her lithium treatment. (Id.)  Plaintiff points to the medical records from her treating psychiatrist, Dr. Rodarte, alleging that her symptoms continued from June 29, 2009, when Nash agreed to take lithium, to her most recent visit in March of 2010. (Id.)

In response, Defendant maintains that Nash's condition was worse in January 2009 but "promptly improved" with treatment. (See Cross-Mot. Summ. J. Attach. #1 Mem. P. & A. 9, ECF No. 13.)   The Commissioner provides five additional reasons for the ALJ's decision to give less weight to Dr. Glassman's opinion:  (1) Dr. Glassman did not review any prior mental health records; (2) he

examined Plaintiff during the time she was refusing to cooperate
with psychiatric treatment; (3) he opined that Nash suffered from
an eating disorder despite the absence of medical records or
testimony of an eating disorder; (4) the treating psychiatrist, Dr.
Rodarte, opined that Nash's social functioning was "mostly
unimpaired"; and (5) Plaintiff gave Dr. Glassman misleading
information regarding her work history and eating disorder. (Id.
at 8-9.)  The Commissioner argues that "[t]hose were valid reasons
for discounting Dr. Glassman's opinion." (Id. at 8-9.)

Nash replies that the Defendant cannot support the ALJ's
decision by marshaling reasons not specifically mentioned by Judge
Godfrey; the Court is required to disregard them. (Pl.'s Reply 4,
ECF No. 14.)  Plaintiff points out that the single rationale
actually articulated by Judge Godfrey for assigning less weight to
the consultative psychiatrist was that Nash later stabilized on
lithium. (Id.)  Plaintiff argues that Defendant fails to address
her argument that, despite lithium, Nash's symptoms continued and
her condition did not meaningfully improve. (Id.)

The Court "cannot affirm the decision of an agency on a ground
that the agency did not invoke in making its decision." Pinto, 249
F.3d at 847.  Judge Godfrey stated:  "The undersigned notes that
the consultative psychiatric evaluation was performed on March 21,
2009, which was before she was stabilized on Lithium; therefore,
less weight can be given to the opinion of Dr. Glassman, the
consultative psychiatrist, than he would ordinarily merit."
(Admin. R. 34, ECF No. 9.)  Because the ALJ did not list any
additional reasons discounting Dr. Glassman's opinions, Defendant's

later justifications cannot serve as a predicate for the agency action. Tommasetti v. Astrue, 533 F.3d at 1039 n.2.

Here, Dr. Glassman, a board-certified psychiatrist, evaluated Nash on March 21, 2009, and opined that she suffered from a "severe borderline personality disorder, an associated eating disorder, and severe somatic preoccupation/somatization." (Admin. R. 434, ECF No. 9.) Because Dr. Glassman was a specialist who actually examined Nash, his opinion was entitled to more weight than a nonexamining physician. Holohan, 246 F.3d at 1202; Lester, 81 F.3d at 830. Plaintiff continued seeing her treating psychiatrist, Dr. Rodarte, who diagnosed a bipolar I disorder with psychotic features. (Admin. R. 502, ECF No. 9.) Even if this difference in diagnosis is viewed as contradictory, the ALJ was still required to offer "specific and legitimate" reasons supported by substantial evidence in the record before she rejected Dr. Glassman's opinion. Lester, 81 F.3d at 830-31; Andrews v. Shalala, 53 F.3d at 1043.

The medical records show that Nash started taking lithium in June 2009. (Admin. R. 561, ECF No. 9.) Although the treating psychiatrist varied her dosage, the response to treatment was only fair. (Id. at 553-60.) Despite the lithium treatment, Nash had poor judgment and insight and her thought process was "circumstantial at times" as of March 29, 2010. (Id. at 553.) At the hearing before Judge Godfrey, Plaintiff testified she continues to hear voices and had a recent emotional setback. (Id. at 79, 68-69.) In light of this, the ALJ's reference to Plaintiff's own assessment ostensibly showing a positive response to medication does not fairly or accurately characterize the mental health treatment evidence as a whole. See Reddick v. Chater, 157 F.3d

715, 722–23 (9th Cir. 1998) (holding that the ALJ impermissibly "developed his evidentiary basis by not fully accounting for the context of materials or all parts of the testimony and reports[]"). Moreover, improvement in Plaintiff's condition does not negate the possibility that her mental impairment was severe.  See 20 C.F.R. pt. 404, subpt. P, App. 1, § 12.00D(2) (2013) ("The level of [an individual's] functioning may vary considerably over time. . . . Proper evaluation of [a mental impairment] must take into account any variations in the level of [the individual's] functioning in arriving at a determination of impairment severity over time."); Lebus v. Harris, 526 F. Supp. 56, 61 (N.D. Cal. 1981) (explaining that symptom-free intervals do not compel a finding of nondisability arising from a mental impairment because "it is extremely difficult to predict the course of mental illness").

Viewing the record as a whole, Judge Godfrey overstated Plaintiff's positive response to treatment and understated the evidence that Nash continued to exhibit symptoms of a mental impairment despite compliance with her medication.  Thus, to the extent Dr. Glassman's opinion was given less weight based on the assertion that Nash stabilized on lithium, that conclusion is not supported by the record.

b.  Treating psychiatrist

Nash argues that the ALJ incorrectly rejected the functional capacity opinion of the treating psychiatrist Dr. Rodarte.  (Pl.'s Mot. Summ. J. Attach. #1 Mem. P. & A. 21-23, ECF No. 11.)  The ALJ stated that Dr. Rodarte's notes are "mostly illegible; and therefore, not able to be used."  (Admin. R. 31, ECF No. 9.) Plaintiff argues that this is factually incorrect because the

progress notes contain check-marked boxes which are easy to interpret, even if the doctor's handwriting is difficult to read. (Pl.'s Mot. Summ. J. Attach. #1 Mem. P. & A. 22, ECF No. 11.)   Nash also contends that the alleged illegibility does not constitute a valid reason for rejecting Dr. Rodarte's opinion, because the ALJ had a duty to clarify the contents of the notes instead of rejecting them altogether.   (Id. at 22-23.)

While plaintiff bears the burden of proving disability, the ALJ in a social security case has an independent "'special duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'"   Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996) (quoting Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983)).   This duty extends to represented and unrepresented claimants.   Celaya v. Halter, 332 F.3d 1177, 1183 (9th Cir. 2003); Smolen, 80 F.3d at 1288.   "The ALJ's duty to develop the record fully is also heightened where the claimant may be mentally ill and thus unable to protect her own interests." Tonapetyan v. Halter, 242 F.3d at 1150.

"Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to 'conduct an appropriate inquiry.'"   Id. (citing Smolen v. Chater, 80 F.3d at 1288; Armstrong v. Comm'r of Soc. Sec. Admin., 160 F.3d 587, 590 (9th Cir. 1998)).   The ALJ may satisfy this duty "by subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record."   Id. (citing Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1998); Smolen, 80 F.3d at 1288).   The ALJ's

duty to contact a treating physician arises when the evidence received from that physician is inadequate to determine disability, contains a conflict, or is ambiguous.  See Tonapetyan, 242 F.3d at 1150-51.  The responsibility to carry out this duty is triggered by the inadequacy of the evidence and falls entirely to the ALJ; it is not part of the claimant's burden.  White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2001).

In this case, the ALJ did not contact Dr. Rodarte for clarification despite finding his notes illegible.  (Admin. R. 31, ECF No. 9.)  Defendant does not address whether the ALJ had a duty to further develop the record after rejecting Dr. Rodarte's handwritten progress notes.  "Where the medical records are crucial to the plaintiff's claim, illegibility of important evidentiary material has been held to warrant a remand for clarification and supplementation."  Miller v. Heckler, 756 F.2d 679, 680 (8th Cir. 1985) (quoting Cutler v. Weinberger, 516 F.2d 1282, 1285 (2nd Cir. 1975).  But see Howard v. Astrue, No. ED CV 09-2116-PLA, 2010 U.S. Dist. LEXIS 112081, at *6 n.6 (C.D. Cal. Oct. 19, 2010) (rejecting contention that ALJ failed to develop the record by not contacting treating physician to clarify notes the ALJ found to be illegible). In Howard, the court found that the plaintiff's failure to provide legible copies of treatment notes was a failure to satisfy plaintiff's burden to provide his disability claim.  Id.  Even if the ALJ insisted that the handwritten portions of the progress notes were not usable, the record in this case was sufficiently developed with consistent medical evidence from several sources.

Judge Godfrey acknowledged that Dr. Rodarte described Plaintiff's diagnosis of bipolar I disorder and related symptoms in

several letters, and opined that Nash was unable to maintain
employment due to her symptoms; however, the ALJ discounted these
letters as identical. (Admin. R. 32, ECF No. 9.) The decision
does not explain why consistent, legible records from the treating
physician were not given appropriate weight.

Generally, more weight is given to the opinions of treating
physicians because they "are likely to be the medical professionals
most able to provide a detailed, longitudinal picture of [the
claimant's] medical impairment(s) and may bring a unique
perspective to the medical evidence that cannot be obtained from
the objective medical findings alone or from reports of individual
examinations, such as consultative examinations or brief
hospitalizations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).
Here, Dr. Rodarte treated Nash regularly for over a year, performed
mental status examinations, and prescribed psychotropic
medications. See 20 C.F.R. §§ 404.1527(c)(2)(i), (ii),
416.927(c)(2)(i), (ii) (stating that weight accorded to a treating
physician's opinion dependent on length of the treatment
relationship, frequency of visits, and nature and extent of
treatment received). Based on the length of the treatment
relationship and his experience with Nash, Dr. Rodarte was in the
best position to opine on Plaintiff's mental condition, which is
supported by the treatment records. See Smolen, 80 F.3d at 1285;
see also 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Lester, 81
F.3d at 833 ("The treating physician's continuing relationship with
the claimant makes him especially qualified to evaluate reports
from examining doctors, to integrate the medical information they
provide, and to form an overall conclusion as to functional

capacities and limitations, as well as to prescribe or approve the overall course of treatment.").

The ALJ discussed the questionnaire completed by Dr. Rodarte, including his findings of social withdrawal, "markedly limited abilities in several of the areas of functioning," and inability to tolerate even low work-related stress. (Admin. R. 33, ECF No. 9.) The decision dismisses these findings as not supported by laboratory of diagnostic tests. (Id.) "Courts have recognized that a psychiatric impairment is not as readily amenable to substantiation by objective laboratory testing as is a medical impairment and that consequently, the diagnostic techniques employed in the field of psychiatry may be somewhat less tangible than those in the field of medicine." Lebus v. Harris, 526 F. Supp. at 60 (citations omitted).

> Mental disorders cannot be ascertained and verified as are most physical illnesses, for the mind cannot be probed by mechanical devices in order to obtain objective clinical manifestations of mental illness. A strict reading of the statutory requirement that an impairment be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques" is inappropriate in the context of mental illnesses.

Hartman v. Bowen, 636 F. Supp. 129, 132 (N.D. Cal. 1986) (citations omitted). When a mental impairment forms the basis for a disability claim, "'[t]he report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic technique.'" See Christensen v. Bowen, 633 F. Supp. 1214, 1220-21 (N.D. Cal. 1986) (citation omitted); see also Montijo v. Sec'y of Health & Human Servs., 729 F.2d 599, 601 (9th Cir.

1  1984) (noting that the ALJ's reliance on the inability of

2  physicians to support their findings with objective laboratory

3  findings does not constitute a legally sufficient reason for

4  rejecting their conclusions) (citation omitted); Day v. Weinberger,

5  522 F.2d 1154, 1156 (9th Cir. 1975) (holding that "[d]isability may

6  be proved by medically-acceptable clinical diagnoses, as well as by

7  objective laboratory findings[]").

8      The ALJ's conclusion that Dr. Rodarte's opinion should be

9  given less weight oversimplifies and discounts the value of the

10 longitudinal history provided by the totality of the treatment

11 records.  The Court finds that the medical evidence, including the

12 opinion of the evaluating psychiatrist Dr. Glassman and the medical

13 expert Dr. Jonas, amply support Dr. Rodarte's opinion.  Therefore,

14 the ALJ's decision to assign less weight to Dr. Rodarte's opinion

15 is not based on legitimate and specific reasons supported by the

16 record.

17     3.  ALJ's credibility finding

18     Plaintiff next argues that Judge Godfrey improperly found

19 Nash's testimony regarding the severity of her symptoms not

20 credible.  (Pl.'s Mot. Summ. J. Attach. #1 Mem. P. & A. 23, ECF No.

21 11.)  Nash contends that the reasons enumerated by the ALJ for

22 discounting Plaintiff's testimony do not meet the requisite "clear

23 and convincing" standard.  (Id. at 24.)

24     "In order for the ALJ to find [claimant's] testimony

25 unreliable, the ALJ must make 'a credibility determination with

26 findings sufficiently specific to permit the court to conclude that

27 the ALJ did not arbitrarily discredit claimant's testimony.'"

28 Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1224 n.3 (9th

40

Cir. 2010) (quoting <u>Thomas</u>, 278 F.3d at 958).  "In evaluating the credibility of a plaintiff's testimony regarding subjective pain, an ALJ must engage in a two-step analysis."  <u>Vasquez v. Astrue</u>, 572 F.3d 586, 591 (9th Cir. 2009) (citing <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1035-36 (9th Cir. 2007)); <u>see</u> <u>Batson v. Comm'r of Soc. Sec. Admin.</u>, 359 F.3d at 1196).  "'First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'"  <u>Vasquez</u>, 572 F.3d at 591 (quoting <u>Lingenfelter</u>, 504 F.3d at 1036).  Second, if the first step is satisfied and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms by giving "'specific, clear and convincing reasons'" for doing so.  <u>Id.</u> (quoting <u>Lingenfelter</u>, 504 F.3d at 1036); <u>accord</u> <u>Smolen v. Chater</u>, 80 F.3d at 1283-84.  Notably, "the ALJ may not reject subjective symptom testimony . . . simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged."  <u>Smolen</u>, 80 F.3d at 1282 (footnote omitted).

Here, Judge Godfrey concluded that Nash's impairments "could reasonably be expected to cause the alleged symptoms . . . ."  (Admin. R. 36, ECF No. 9.)  The first prong of the ALJ's inquiry regarding Plaintiff's credibility is therefore satisfied.  <u>See</u> <u>Vasquez</u>, 572 F.3d at 591.  There is no evidence of malingering.  Consequently, the Court must determine whether Judge Godfrey provided clear and convincing reasons for the adverse credibility finding that are supported by the evidence in the record.  <u>See</u>

1  <u>Reddick v. Chater</u>, 157 F.3d at 722 (quoting <u>Lester v. Chater</u>, 81
2  F.3d at 834).

3       To support a finding that the plaintiff was not credible, the
4  ALJ must "'point to specific facts in the record which demonstrate
5  that [the plaintiff] is in less pain than she claims.'" <u>Vasquez</u>,
6  572 F.3d at 592 (quoting <u>Dodrill v. Shalala</u>, 12 F.3d 915, 918 (9th
7  Cir. 1993)). The ALJ must make specific findings "stat[ing] which
8  pain testimony is not credible and what evidence suggests the
9  complaints are not credible." <u>Dodrill</u>, 12 F.3d at 918. A
10 reviewing court will not speculate as to the ALJ's reasons for
11 rejecting a plaintiff's allegations of disabling pain. <u>Bunnell v.</u>
12 <u>Sullivan</u>, 947 F.2d 341, 346 (9th Cir. 1991) (citing <u>Murray v.</u>
13 <u>Heckler</u>, 722 F.2d 499, 502 (9th Cir. 1983)); <u>see also</u> <u>Steele v.</u>
14 <u>Barnhart</u>, 290 F.3d 936, 941 (7th Cir. 2002) (explaining that the
15 ALJ must state an accurate and logical connection between the
16 evidence and the decision).

17      In general, questions of credibility are for the ALJ to
18 resolve. <u>Sample v. Schweiker</u>, 694 F.2d 639, 642 (9th Cir. 1982).
19 Courts should not "second-guess" an ALJ's credibility
20 determination. <u>See</u> <u>Allen v. Heckler</u>, 749 F.2d 577, 580 (9th Cir.
21 1984) (discussing credibility of medical testimony). If the
22 evidence is conflicting and could be rationally interpreted more
23 than one way, the Court must uphold the ALJ's decision. <u>Id.</u> at
24 579.

25      Social Security Ruling 96-7p provides the relevant standard:
26      4. In determining the credibility of the individual's
        statements, the adjudicator must consider the entire case
27      record, including the objective medical evidence, the
28

42                                      12cv2781 GPC(RBB)

individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.  An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

5. It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p, 1996 SSR LEXIS 4, at *2-4 (July 2, 1996).

The Ninth Circuit has articulated the grounds on which an ALJ may properly discredit a claimant's testimony:

In weighing a claimant's credibility, the ALJ may consider [claimant's] reputation for truthfulness, inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains.

Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997) (citations omitted).  Where the ALJ's credibility assessment is supported by substantial evidence, it will not be disturbed even where some of the reasons for discrediting a claimant's testimony were improper.  Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1163 (9th Cir. 2008); see also Tonapetyan v. Halter, 242 F.3d at 1147-48.

43

The ALJ in this case rejected Plaintiff's testimony about her subjective symptoms as not credible. (Admin. R. 35, ECF No. 9.) The decision first explains that Nash's activities of daily living do not support a finding of disability. Judge Godfrey specified that "independently caring for her own personal hygiene; light housework; cooking; laundry duties; taking walks; reading; attending doctor's appointments; and trying to live a 'normal' life" were all actions not consistent with having a disabling condition. (Id.)

Plaintiff argues that none of the activities requires the "consistent mental acuity attendant to full-time work." (Pl.'s Mot. Summ. J. Attach. #1 Mem. P. & A. 24, ECF No. 11.) Nash also points out that although a credibility determination may be based on a claimant's daily activities, the claimant must engage in them for a substantial part of the day. (Id.)

The Ninth Circuit has held the "mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability." Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001). One does not need to be "utterly incapacitated" to be disabled. Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989). "[M]any home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication." Id.

The Ninth Circuit has identified some of the factors for deciding whether a claimant's daily activities may be the basis for an adverse credibility determination. Orn v. Astrue, 495 F.3d at

44

639.  The court will consider whether a claimant's daily activities contradict the claimant's other testimony.  Id.  It will also determine whether the daily activities meet the threshold for transferable work skills.  Id.  "The ALJ must make 'specific findings relating to [the daily] activities' and their transferability to conclude that a claimant's daily activities warrant an adverse credibility determination."  Id. (alteration in original) (quoting Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005)).

Defendant does not discuss the standard for evaluating Nash's daily activities or whether the ALJ correctly applied it in this case.  Instead, the Commissioner restates that Plaintiff engages in normal daily activities, including "getting out every day and taking walks." (Cross-Mot. Summ. J. Attach. #1 Mem. P. & A. 7, ECF No. 13.)  Although Plaintiff filled out a questionnaire describing her activities of daily living, (Admin. R. 292-308, ECF No. 9), and her doctor concluded that Nash was able to carry out activities of daily living, (id. at 547), Plaintiff stated that during periods of depression, she sometimes did not leave her apartment. (Id. at 93.)  Plaintiff testified that she suffers from manic periods when she feels either "really high or really low," and sometimes has crying spells that last for days. (Id. at 78, 83.)

The ALJ does not mention whether Plaintiff's daily activities contradicted her other testimony. (Id. at 35); see Orn, 495 F.3d at 639.  Furthermore, to rely on a Plaintiff's daily activities to support an adverse credibility determination, the claimant's daily activities must correspond to transferable work skills.  See Orn, 495 F.3d at 639.  Here, Judge Godfrey did not attempt to correlate

45

Plaintiff's activities to a particular type of job, nor did she
discuss whether Nash engaged in these physical activities for a
substantial part of the day.  See Reddick, 157 F.3d at 722 (holding
that sporadic activities followed by periods of rest are not
inconsistent with subjective complaints of severe pain).

The next two reasons stated by the ALJ for rejecting Nash's
symptom testimony involve her physical impairment.  The decision
argues that Nash denied being depressed or suicidal on October 20,
1997, and contemporaneous records showed that Plaintiff's Meniere's
disease symptoms were slowly improving.  (Admin. R. 35, ECF No. 9.)
In her Motion, Plaintiff argues that the records generated by
physicians who treated her for Meniere's disease do not adequately
reflect her psychiatric disorder.  (Pl.'s Mot. Summ. J. Attach. #1
Mem. P. & A. 25, ECF No. 11.)

The medical records from October 20, 1997, reflect Plaintiff's
surgery and follow-up visit in connection with her Meniere's
disease.  Plaintiff's Meniere's disease is not the principal basis
of her disability claim.  Still, a review of the notes from the
follow-up demonstrates that even though Nash denied being depressed
or suicidal on that day, she nonetheless requested a referral to a
psychiatrist because "several of her physicians have recommended
this in the past." (Admin. R. 409, ECF No. 9.)  At the
administrative hearing, Plaintiff testified that she attempted
suicide once when she was twenty.  (Id. at 83.)

Evidence in the record about Plaintiff's follow-up visit on
October 20, 1997, is not inconsistent with Nash's testimony
regarding the severity of her symptoms.  Additionally, Plaintiff's
lack of insight into her disease is reflected in other medical

46

evidence.  For example, Nash admitted to Dr. Glassman that she told her primary care doctor that she had recently driven "to the railroad tracks" with a plan to kill herself, at the same time denying having mental problems and attributing her issues to Meniere's disease.  (Id. at 430-31.)  Dr. Glassman reported that "[Nash] has a history of one suicide attempt in her early 20s when she 'took a butcher knife out.'"  (Id. at 432.)

The ALJ also questioned Plaintiff's credibility based on her statements to staff at the Neighborhood Healthcare Center on January 14, 2009, and to Dr. Glassman on March 21, 2009, that "she had not worked since 1996," while her earnings records demonstrated otherwise.  (Id. at 35.)  Plaintiff argues that she had no intention to deceive the medical professionals, and that her actual statements convey that she has not held a permanent full-time position since 1997.  (Pl.'s Mot. Summ. J. Attach. #1 Mem. P. & A. 25, ECF No. 11.)  The Commissioner replies that the ALJ may consider any inconsistencies between the claimant's testimony and her work record in assessing Nash's credibility.  (Cross-Mot. Summ. J. Attach. #1 Mem. P. & A. 6, ECF No. 13.)

"In reaching a credibility determination, an ALJ may weigh inconsistencies between the claimant's testimony and his or her conduct, daily activities, and work record, among other factors." Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1227 (9th Cir. 2009); see Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ's credibility findings "'must be sufficiently specific to allow a reviewing court to conclude the [ALJ] rejected [the] claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony.'"  Moisa v.

<u>Barnhart</u>, 367 F.3d 882, 885 (9th Cir. 2004) (alteration in
original) (quoting <u>Rollins v. Massanari</u>, 261 F.3d 853, 856-57 (9th
Cir. 2001)).  If the ALJ's interpretation of the claimant's
testimony is reasonable and is supported by substantial evidence,
it is not the court's role to "second-guess" it.  <u>Rollins</u>, 261 F.3d
at 857.

As an initial matter, the Commissioner does not claim that
Nash misrepresented her work history at the administrative hearing.
Despite having trouble remembering specific dates, Nash responded
to questions about her relevant work experiences.  (<u>See</u> Admin. R.
51-62, ECF No. 9.)  The ALJ's decision does not point to any
inconsistencies between Nash's testimony at the hearing and her
work records.

With regard to Plaintiff's statements to her doctors, the ALJ
failed to explain how those demonstrate that Nash was not candid or
forthcoming regarding her work history.  The one-page Neighborhood
Healthcare progress notes from January 14, 2009, state that Nash
"hasn't worked since 1996[.]"  (<u>Id.</u> at 397.)  It is not clear in
what context Plaintiff made that statement.  Statements to Dr.
Glassman are not as damning as the ALJ suggests.  Dr. Glassman's
evaluation indicates that Plaintiff "last worked full time in
1997," and her "last temporary job was in June 2008 as an
administrative assistant."  (<u>Id.</u> at 430.)  Dr. Glassman also noted
that Nash was "a very poor historian, very scattered and somewhat
disorganized."  (<u>Id.</u> at 431.)

The fact that Nash did not provide a complete account of her
work history to the Neighborhood Healthcare is not sufficient
reason for discrediting her testimony.  At the administrative

hearing, Nash testified about her various full-time, part-time, and temporary jobs.  (Id. at 51-61.)  For example, she described working at Helix High School for one and one-half hours a day; her hours increased up to twenty hours a week; and eventually she worked up to thirty hours a week.  (Id. at 54-55.)  Plaintiff disclosed these positions to the Social Security Administration in the questionnaires she completed.  (Id. at 271, 284.)  Plaintiff's spotty work history and variable description of her work history are consistent with her symptoms of having disorganized and tangential thought process, as noted by both Dr. Glassman and her treating psychiatrist, Dr. Rodarte.  See Panqus v. Colvin, No. EDCV 12-00103-MAN, 2013 WL 2285343, at *4 (C.D. Cal. May 23, 2013) ("Rather than detracting from plaintiff's credibility, as the ALJ concluded, plaintiff's inability to recall the details surrounding the procedures he has undergone and his diagnoses appears to be consistent with his learning disability and his testimony that he experiences confusion.")  The ALJ's reference to deception is not supported by the record.

The administrative law judge also found Nash not credible based on her refusal to take psychiatric medications or medications for her physical symptoms; as reported on December 16, 2008, Plaintiff took only vitamins, amino acids, and fish oil at that time.  (Admin. R. 35-36, ECF No. 9.)  Plaintiff argues that the ALJ's reasoning is inconsistent because Judge Godfrey also found that Nash's condition improved with lithium.  (Pl.'s Mot. Summ. J. Attach. #1 Mem. P. & A. 25-26, ECF No. 11.)

An ALJ may find that a claimant's unexplained or inadequately explained refusal to seek or follow a course of treatment, that

would alleviate the alleged disabling symptoms, supports finding that the claimant's testimony was not credible.  See Smolen v. Chater, 80 F.3d at 1284 (stating that ALJ may consider a claimant's compliance with her prescribed treatment in assessing the credibility of a claimant's testimony regarding the severity of her symptoms); see also Lewis v. Apfel, 236 F.3d 503, 513–14 (9th Cir. 2001) (ALJ properly rejected a treating physician's letter that the claimant's seizures had not been fully controlled where other evidence in the record suggested that the claimant had not consistently complied with his treatment regime); 20 C.F.R. § 404.1530(a) ("In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work."); 20 C.F.R. § 404.1530(b) ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled . . . .").  In evaluating a claimant's reasons for failing to follow prescribed treatment, the ALJ must consider, among other things, the claimant's physical and mental limitations. See 20 C.F.R. § 404.1530(c).

Plaintiff's unwillingness to take psychiatric medications in the past is related to her lack of insight into her disorder. During her evaluation with Dr. Glassman, Nash insisted that she was not psychotic and did not need to take the "psychiatric meds." (Admin. R. 432, ECF No. 9.)  Plaintiff eventually began taking lithium and was compliant with her treatment at the time of the hearing.  Judge Godfrey did not take into account Nash's psychiatric condition as a possible explanation for Plaintiff's claimed refusal to take psychiatric medications.  See 20 C.F.R. § 404.1530(c).  The conclusion that Nash's prior refusal to take

medication warrants finding that her testimony is not credible is not supported by substantial evidence.  See Brashears v. Apfel, 73 F. Supp. 2d 648, 652 (W.D. La. 1999) (remanding where evidence from mental health provider show plaintiff's noncompliance may be beyond her control); see also Sharp v. Bowen, 705 F. Supp. 1111, 1123-24 (W.D. Pa. 1989) (diabetic who injected insulin into his pillow and ate junk food rather than prescribed diet did so because of severe personality disorder, providing justifiable cause for noncompliance).  "The 'reasonable man' standard . . . is clearly not applicable to [mentally ill claimants]. . . .  To deny this person benefits . . . because he is not acting under a 'reasonable fear' mocks the idea of disability based on mental impairments." Benedict v. Heckler, 593 F. Supp. 755, 761 (E.D.N.Y. 1984) (using a subjective definition of justifiable cause for refusing treatment). Because there is evidence in the record that Nash's prior refusal to take psychiatric medications was related to her disorder, and not a result of her conscious choice, the ALJ's finding was error.

Judge Godfrey also found Nash not credible because she was able to take college courses until stopping in 2005.  (Admin. R. 35, ECF No. 9.)  The ALJ concluded that the level of attention required for graduate courses was inconsistent with an inability to perform any work.  (Id. at 36.)  Plaintiff argues that ceasing to attend college courses does not make a mental disability claim suspect, and there is no evidence her attendance had been regular. (Pl.'s Mot. Summ. J. Attach. #1 Mem. P. & A. 26, ECF No. 11.)

The evidence in the record does not show that Nash was a full-time student and spent a substantial period of her day at school or engaged in school activities.  She testified at the hearing that it

took her fourteen years and special accommodations to obtain her
undergraduate degree.  (Id.)  The ALJ did not specify how
Plaintiff's attempts to continue schooling demonstrate her ability
to engage in substantial gainful activity.  The ability to perform
limited activities such as attending college is not substantial
evidence that her symptoms are not disabling.  See 20 C.F.R.
§ 404.1572(c) ("Generally, we do not consider activities like
taking care of yourself, household tasks, hobbies, therapy, school
attendance, club activities, or social programs to be substantial
gainful activity.").  Other courts have found that "[a]ttending
college on a part-time basis is not the equivalent of being able to
engage in substantial gainful activity." Parish v. Califano, 642
F.2d 188, 191 (6th Cir. 1981); Cohen v. Sec'y Dept. Health & Human
Servs., 964 F.2d 524, 530 (6th Cir. 1992) (the fact that disability
claimant continued ballroom dancing and attended law school during
period for which she claimed disability benefits did not warrant a
finding that she could maintain substantial gainful employment).

     Furthermore, to the extent the ALJ implied that Plaintiff's
work history was not consistent with a disability, she failed to
consider whether the record indicates a pattern of employment that
establishes Nash's inability to sustain or keep a job due to her
psychiatric limitations.  Here, the record establishes that
Plaintiff was last employed in 2006 or 2007 on a part-time basis
through a temporary agency. (Admin. R. 51, ECF No. 9.)  After the
temporary work assignments ended, Nash was not able to secure other
employment.  (Id. at 52.)  Her sporadic work record and her
testimony corroborate the medical evidence.  Nash testified she was
unable to keep a job and that she was terminated from her training

position with the County of Riverside for being too slow.  (Id. at
53.)  Dr. Rodarte, her treating psychiatrist, opined that Nash was
unable to work in any field for the next twelve consecutive months
due to her bipolar disorder.  (Id. at 549.)

Even assuming Nash could find employment, it is not clear she
could maintain it for a significant length of time.  In Gatliff,
the Ninth Circuit considered whether a claimant who cannot keep a
job for more than approximately two months is considered disabled.
Gatliff v. Comm'r of Soc. Sec. Admin., 172 F.3d 690, 694 (9th Cir.
1999).  In that case, the vocational expert testified that Gatliff
could only be expected to stay in any one job for a "couple of
months" before being fired as a result of his mental impairments,
and that "Gatliff's pattern -- the ability to obtain, but not
maintain, jobs -- would continue."  Id. at 691.  The court rejected
the Commissioner's argument that Gatliff was capable of substantial
gainful activity because he was not precluded from moving from one
job to the next job.  The Ninth Circuit observed that other
circuits have "imposed a durational requirement on the concept of
substantial gainful activity."  Id. at 693.  The court was
persuaded and stated that "substantial gainful activity means more
than merely the ability to find a job and physically perform it; it
also requires the ability to hold the job for a significant period
of time."  Id. at 694; see Pagan v. Bowen, 862 F.2d 340, 350 (D.C.
Cir. 1988) ("The critical question is not whether the claimant has
been stable enough to work for short periods, but whether he or she
is able 'to hold whatever job he finds for a significant period of
time.'") (quoting Singletary v. Bowen, 798 F.2d 818, 822 (5th Cir.
1986))); Kangas v. Bowen, 823 F.2d 775, 778 (3rd Cir. 1987)

1   (reversing and remanding where ALJ did not consider whether

2   claimant could maintain "regular, continuing or sustained"

3   employment in light of his frequent hospitalizations); Parish v.

4   Califano, 642 F.2d at 192 ("The phrase 'substantial gainful

5   activity' implies employment with some degree of regularity.");

6   Wilson v. Richardson, 455 F.2d 304, 305, 307 (4th Cir. 1972)

7   (finding that claimant's holding eleven jobs in three years "may

8   demonstrate not his ability, but his inability to engage in

9   substantial gainful activity[]").

10       Another stated reason given by the ALJ to discredit

11   Plaintiff's testimony was that in April of 2009, Nash told Dr.

12   Tamiry, an internist, that "she was doing fine" until she entered

13   menopause, which brought more vertigo attacks. (Admin. R. 36, ECF

14   No. 9.) Plaintiff points out that her statement was made in the

15   context of a physical evaluation and did not necessarily reflect

16   her psychological state. (Pl.'s Mot. Summ. J. Attach. #1 Mem. P. &

17   A. 26, ECF No. 11.) As discussed above, the record is replete with

18   evidence of Plaintiff's lack of insight into her psychiatric

19   condition, and her attributing her problems to vertigo or Meniere's

20   disease. If anything, the statement regarding her "doing fine" is

21   consistent with that pattern.

22       Judge Godfrey also found Nash not credible on the basis that

23   neither treating physicians nor a state agency doctor opined that a

24   listing level limitation was met or equaled. (Admin. R. 36, ECF

25   No. 9.) As mentioned above, Dr. Jonas, the medical expert, opined

26   that Nash met listing 12.03. (Id. at 94, 109.) Still, he also

27   observed that Nash suffered from a "range of issues." (Id. at 94.)

28   He testified that the range included "12.04 [affective disorder],

54

references, at least in the personal testimony to 12.06 [anxiety-related disorders], some consideration to 12.07 [somatoform disorders], and in [exhibit] 5F we get 12.08 [personality disorder]. . . ." (<u>Id.</u>) "[Affective disorder] interestingly is the working diagnosis for the treater . . . ." (<u>Id.</u>)

Finally, the ALJ made a general statement that the medical record does not establish impairments that could produce disabling pain or other limitations as alleged for any period of twelve or more continuous months. (<u>Id.</u> at 36.) This reason does not directly support an adverse credibility determination. As discussed above, the opinions of the treating and consultative psychiatrists, when properly credited, as well as that of the medical expert, provide ample evidence of disability.

In sum, the ALJ failed to provide clear and convincing reasons for finding Plaintiff's testimony not credible. <u>See Reddick v. Chater</u>, 157 F.3d at 722. This constitutes error.

**C.   Remand for Award of Benefits**

"Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." <u>Benecke v. Barnhart</u>, 379 F.3d 587, 593 (9th Cir. 2004) (citing <u>Harman v. Apfel</u>, 211 F.3d 1172, 1178 (9th Cir. 2000)). If, however, the record has been fully developed and further proceedings would serve no useful purpose, the court should remand for an immediate award of benefits. <u>Id.</u> at 593 (citing <u>Smolen</u>, 80 F.3d at 1292).

> More specifically, the district court should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the

record that the ALJ would be required to find the claimant disabled were such evidence credited.

Id. (citing Harman, 211 F.3d at 1178).

In this case, the Harman test is satisfied. The ALJ did not provide legally sufficient reasons for rejecting the opinions of Dr. Rodarte, Plaintiff's treating psychiatrist; Dr. Glassman, an examining psychiatrist; and Dr. Jonas, an independent medical expert. The examining psychiatrist Dr. Glassman assessed her GAF at 45 in March 2009, finding that "[s]he has major problems functioning." (Admin. R. 434, ECF No. 9.) The treating psychiatrist diagnosed bipolar I disorder with psychotic features and assigned a GAF score of 50 in May of 2010, after Nash began her lithium treatment. (Id. at 571.) Dr. Rodarte's notes explain that despite the course of treatment with various doses of lithium, Plaintiff was severely limited in her functioning due to her mental impairment. (Id. at 576-78.) At the administrative hearing, the independent medical expert testified that Nash met the criteria of listing 12.03. (Id. at 94-113.) It is clear from the record that the ALJ would be required to find Plaintiff disabled if she had properly credited Dr. Rodarte's, Dr. Glassman's, and Dr. Jonas's opinions.

In Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1988), the Ninth Circuit found that substantial evidence did not support the conclusion that the claimant's condition did not meet or equal a listed impairment because the ALJ did not provide specific reasons for disregarding the opinion of the treating physician. Rather than remanding for further proceedings, the Ninth Circuit accepted the treating physician's opinion and ordered the payment of benefits. Id. In Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir.

56

1987), the Ninth Circuit awarded benefits because no legitimate

reasons were given for disregarding the physician's opinion and the

Secretary's decision was not supported by substantial evidence.

Again, in <u>Pitzer v. Sullivan</u>, 908 F.2d 502, 506 (9th Cir. 1990),

the court awarded benefits when the ALJ did not provide legitimate

reasons for disregarding the opinion of the treating physician and

there was "no legitimate conflicting testimony."  Accordingly, a

remand for an award of benefits is proper.

### IV.   CONCLUSION

For the reasons above, the Court recommends that Plaintiff's

Motion for Summary Judgment be **GRANTED**, the Commissioner's Cross-

Motion for Summary Judgment be **DENIED**, and the case be **REMANDED** for

an award of benefits.

This Report and Recommendation will be submitted to the United

States District Court judge assigned to this case, pursuant to the

provisions of 28 U.S.C. § 636(b)(1).  Any party may file written

objections with the Court and serve a copy on all parties on or

before **February 10, 2014**.  The document should be captioned

"Objections to Report and Recommendation."  Any reply to the

objections shall be served and filed on or before **February 20,**

**2014**.  The parties are advised that failure to file objections

within the specified time may waive the right to appeal the

district court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir.

1991).

**IT IS SO ORDERED.**

DATED: January 24, 2014

Ruben B. Brooks, Magistrate Judge
United States District Court

cc:
Judge Curiel
All Parties of Record